729 So.2d 373 (1999)
MEMORIAL HOSPITAL-WEST VOLUSIA, INC., Petitioner,
v.
NEWS-JOURNAL CORPORATION, Respondent.
No. 90,835.
Supreme Court of Florida.
January 21, 1999.
Rehearing Denied March 31, 1999.
*375 John Beranek of Ausley & McMullen, Tallahassee, Florida, and Larry R. Stout of Smith, Hood, Perkins, Loucks, Stout, Orfinger & Selis, Daytona Beach, Florida, for Petitioner.
Jonathan D. Kaney, Jr. and Jonathan D. Kaney, III, of Cobb Cole & Bell, Daytona Beach, Florida, for Respondent.
William A. Bell, Tallahassee, Florida, for Florida Hospital Association, Amicus Curiae.
Neil H. Butler of Butler & Long, Tallahassee, Florida, John E. Thrasher, Timothy W. Volpe and Leslie A. Wickes of Smith, Hulsey & Busey, Jacksonville, Florida, and Karen Peterson, Tallahassee, Florida, for The Association of Community Hospitals and Health Systems of Florida, Inc., Amicus Curiae.
Robert A. Butterworth, Attorney General, and Patricia R. Gleason, Assistant Attorney General, Tallahassee, Florida, for State of Florida, Amicus Curiae.
David S. Bralow, Carol Jean LoCicero and James B. Lake of Holland & Knight LLP, Tampa, Florida, for Fernandina Beach News-Leader, Inc., et al., Amici Curiae.
Patricia Fields Anderson of Rahdert, Anderson, McGowan & Steele, P.A., St. Petersburg, Florida, for Times Publishing Company and the American Civil Liberties Union Foundation of Florida, Inc., Amici Curiae.
Emeline C. Acton, Hillsborough County Attorney, and Mary Helen Campbell, Assistant County Attorney, Tampa, Florida, for Hillsborough County Hospital Authority, Amicus Curiae.
Richard A. Harrison of Allen, Dell, Frank & Trinkle, P.A., Tampa, Florida, and Frederick B. Karl of Annis, Mitchell, Cockey, Edwards & Roehn, P.A., Tampa, Florida, for Florida Health Sciences Center, Inc. d/b/a Tampa General Hospital, Amicus Curiae.
WELLS, J.
We have for review News-Journal Corp. v. Memorial Hospital-West Volusia, Inc., 695 So.2d 418 (Fla. 5th DCA 1997), in which the district court expressly construed article I, section 24 of the Florida Constitution. We have jurisdiction. Art. V, § 3(b)(3), Fla. Const.
This case involves the construction and application of article I, section 24(a) (access to public records) and (b) (access to meetings of public agencies)[1] to a private nonprofit corporation's operation of hospital facilities transferred to it by the West Volusia Hospital Authority (Authority), a hospital taxing authority, pursuant to section 155.40, *376 Florida Statutes (1993).[2] Respondent News-Journal Corporation (News-Journal) filed a complaint in the circuit court seeking a declaratory decree that the records of petitioner Memorial Hospital-West Volusia, Inc. (West Volusia, Inc.), a nonprofit organization, were subject to the Public Records Act[3] and that meetings of West Volusia, Inc.'s board of directors were subject to the Sunshine Law.[4] After the case was at issue and discovery was completed, the parties filed cross-motions for summary judgment. The circuit court entered a summary final judgment in favor of West Volusia, Inc. The court concluded that the Public Records Act did not apply because West Volusia, Inc. was not acting "on behalf of" a public agency as specified in both the Public Records Act and article I, section 24 of the Florida Constitution. The court agreed with West Volusia, Inc.'s analysis and conclusions as to the factors this Court enunciated in News & Sun-Sentinel Co. v. Schwab, Twitty & Hanser Architectural Group, Inc., 596 So.2d 1029 (Fla.1992).[5] The court also concluded that West Volusia, Inc. was not subject to the Sunshine Law.
On appeal, the Fifth District Court of Appeal reversed and held that West Volusia, Inc. was subject to the constitutional obligations of article I, section 24. News-Journal Corp., 695 So.2d at 421. The Fifth District reasoned that "[i]n a broad, general sense, [West Volusia, Inc.] was acting `on behalf of the Authority in continuing to fulfill the Authority's responsibility to provide hospital services to its constituents." Id. at 420. The court discussed our decision in Schwab, which set forth factors for courts to consider in deciding whether a private entity is acting on behalf of a public agency and thus whether the entity is subject to public records disclosure. Id. The Fifth District distinguished this case from Schwab by noting that in Schwab an architect provided services to a school board, whereas in this case the not-for-profit West Volusia, Inc. provided services in place of the Authority, which is a public body. Id. at 421-22. Using the Schwab factors, the district court undertook a legal analysis of the undisputed facts and concluded that West Volusia, Inc. was acting on behalf of the Authority and therefore was subject to the Public Records Act. Id. at 422.
The Fifth District also held that although article I, section 24(b) of the Florida Constitution does not contain a provision for persons acting on behalf of public agencies as does article I, section 24(a), such a provision is implicit in the requirement that all meetings of public bodies in which the public business of such body is to be transacted or discussed shall be open to the public. Id. at 422. Thus, the Fifth District concluded that West Volusia, Inc. was subject to the Sunshine Law. Id.
This case results from the natural tension between the privatization of traditionally public services and this State's constitutional commitment to public access to records and meetings concerning public business. The current trend toward privatization in respect to public tax-supported hospitals includes the transfer from public to private agencies of *377 both public functions and the public assets supporting such functions. This case represents a continuation of efforts during the past two decades to privatize public hospitals in Florida.
In the 1920s, the legislature first authorized the creation and maintenance of hospitals through special acts establishing independent taxing districts within prescribed boundaries in counties. These taxing districts were intended to operate as separate government entities with the single governmental purpose and function of creating and maintaining hospitals and other medical facilities within the boundaries of specified districts.
In 1957, the legislature created the West Volusia Hospital Authority, an independent taxing district. Ch. 57-2085, § 1, at 308-09, Laws of Fla. The special act authorizing the Authority provides for a governing board of five commissioners elected for two-year terms. Id. § 2 at 309. Each hospital or clinic established by the Authority must provide medical care for the indigent without charge. Id. § 19 at 314. The Authority's governing board is authorized and empowered to establish, construct, operate, and maintain such hospital or hospitals as in its opinion shall be necessary for use of the people of the district. Id. § 5 at 310. The legislature found the maintenance of such hospitals within the district to be a public purpose which is necessary for the preservation of the public health. Id. The public hospitals are to be operated for public use and for the welfare of said district and its inhabitants. Id. The governing board of the Authority has the power to condemn and acquire real or personal property through eminent domain, to borrow money, to sell bonds, and to assess and levy ad valorem taxes against property within the district for the operation, maintenance, and repair of its hospitals, or for the payment of the authorized outstanding indebtedness of the taxing district. Id. §§ 6-16 at 310-314.[6]
Pursuant to this special act and using the governmental powers afforded to it, the Authority developed and operated two hospitals in Deland: Fish Memorial Hospital and West Volusia Memorial Hospital. By 1994, West Volusia Memorial Hospital had grown into a licensed and accredited acute-care general hospital with approximately 156 beds, 850 full-time employees, 64 physicians on active staff, and $35.6 million in total assets.
Beginning in the late 1970s, high costs and increased competition from private hospitals led the boards of Florida hospital taxing districts such as the West Volusia Hospital Authority to conclude that it was in the best interests of their districts to consider methods for successfully adapting their public hospitals to the competitive markets in their districts. See Sarasota Herald-Tribune Co. v. Community Health Corp., 582 So.2d 730, 731 (Fla. 2d DCA 1991). A strategy that was considered was the leasing of the district's assets to a not-for-profit corporation which would manage and operate the taxing district's hospital facilities. However, according to the Attorney General, special taxing districts were required to obtain the legislature's permission to lease their hospital facilities. Op. Att'y Gen. Fla. 80-18 (1980). Following the 1980 opinion of the Attorney General, the 1982 Legislature enacted section 155.40, Florida Statutes (1983), which by general law authorized independent special taxing districts to enter into leases and operating agreements for existing hospital facilities with not-for-profit Florida corporations.[7]
In 1994, the board of the West Volusia Hospital Authority decided to enter into a lease and operating agreement (Agreement) as authorized by section 155.40, Florida Statutes (1993). The Agreement culminated *378 an effort begun in 1993, when the Authority solicited and then considered various proposals to lease or manage West Volusia Memorial Hospital. The Authority selected a proposal submitted by Memorial Health Systems, Inc.(Memorial), a private, not-for-profit corporation that owned and managed hospitals in Volusia and Flagler counties. Memorial proposed that the Authority contract with it "to establish a separate tax-exempt 501(c)(3) subsidiary corporation ... for the express purpose of leasing the Hospital assets and facilities from the Authority and operating it for the benefit of the residents of the West Volusia Taxing Authority." Record on Appeal at 673. The Authority and Memorial executed a letter of intent on June 6, 1994. Memorial Hospital-West Volusia, Inc., a Florida not-for-profit corporation, was chartered on June 16, 1994.
On July 28, 1994, the parties executed the Agreement, formally styled "Lease and Transfer Agreement Between and Among West Volusia Hospital Authority, Memorial Hospital-West Volusia, Inc. and Memorial Health Systems, Inc." West Volusia, Inc. undertook operational control of the hospital on December 1, 1994. The Agreement leases to West Volusia, Inc. the Authority's "Existing Facilities," defined as meaning "the Hospital, the Real Property, the Equipment, and all Improvements which are leased by Lessor to Lessee [in the lease]." The Agreement grants to West Volusia, Inc. the right to operate the existing hospital facilities to provide health care. The Agreement transfers to West Volusia, Inc. for the term of the Agreement, all of the Authority's right, title, and interest in and to the working capital assets,[8] operating assets,[9] and existing facilities operations.[10] Covenants require West Volusia, Inc. to maintain the facilities to a specified level. All improvements and personal property either revert or convert to being property of the Authority at the conclusion of the term of the Agreement, which is forty years.
*379 Under the Agreement, West Volusia, Inc. and Memorial agreed to commit a minimum of $26.4 million to fund capital expenditures. West Volusia, Inc. paid as rent the Authority's bonded debt of $8,181,382 and assumed another $654,322 of the Authority's debt. No other rents are required. All cash flow from the hospital facilities, including government reimbursement for indigent care, is to go to West Volusia, Inc. As of closing adjustments on May 26, 1995, the value of the transferred assets exceeded the liabilities by $19.5 million, based upon calculations made by Memorial's chief financial officer.[11]
The Agreement contains a covenant by the Authority that during the term of the Agreement it shall not, without prior consent of West Volusia, Inc. construct, fund, own, manage, or operate any other acute-care hospital facility, ambulatory surgical center, emergency center, or any similar facility in Volusia County.[12] The Agreement further requires that the Authority will not provide or fund any health care related services that compete with the services offered by West Volusia Hospital without giving West Volusia, Inc. first refusal on provision of the service.
With the exception of certain limited preexisting agreements, the Agreement states that West Volusia, Inc. will provide indigent care for the indigent sick in the taxing district. After the first two years of the term, the rate agreed to be paid by the Authority to West Volusia, Inc. is 105 percent of West Volusia, Inc.'s reasonable cost of providing such indigent services on a case-by-case basis. The method for determining West Volusia, Inc.'s reasonable cost is to be consistent with acceptable methods for cost accounting under generally accepted accounting principles. The Authority has no right to approve or disapprove West Volusia, Inc.'s overhead expenditures.
The business affairs of West Volusia, Inc. are governed by a board of directors. The board consists of nine voting members and two nonvoting members. The Authority may appoint one nonvoting member.
The Agreement provides for termination of the Agreement by reason of default by West Volusia, Inc. as specified in the Agreement or by West Volusia, Inc.'s failure to meet performance standards attached to the lease. Upon termination of the Agreement, West Volusia, Inc. is to surrender possession of the hospital facilities and transfer to the Authority an amount equal to the beginning net working capital as set forth in the Agreement.

PUBLIC RECORDS
We agree with the Fifth District that, pursuant to article I, section 24(a) of the Florida Constitution, West Volusia, Inc. is acting on behalf of the Authority in performing and carrying out obligations of the Agreement. We find no error in the district court's legal determinations of each factor listed in our Schwab decision. However, as we made clear in Schwab, an analysis of the individual factors we listed in Schwab "provides guidance for making such a determination," but it is the totality of factors that controls the determination. Schwab, 596 So.2d at 1031-32.
In this case, the totality of factors demonstrates that the authorized function of the Authority has been transferred and thereby delegated to West Volusia, Inc. through the transfer of operation and maintenance of the hospitals. The Authority's fundamental public mandate is inescapable, based upon a reading of the special act that created the Authority and upon which the continued viability of the Authority depends:
Section 5. Said Board of Commissioners [of the West Volusia Hospital Authority] is hereby authorized and empowered to establish, construct, operate, and maintain *380 such hospital or hospitals as in their opinion shall be necessary for the use of the people of said district. Said hospital or hospitals shall be established, constructed, operated and maintained by said Board of Commissioners for the preservation of the public health, and for the public good and for the use of the public of said district; and maintenance of such hospital or hospitals within said district is hereby found and declared to be a public purpose and necessary for the preservation of the public health and for the public use and for the welfare of said district and inhabitants thereof. The location of such hospital or hospitals shall be determined by said Board.
Ch. 57-2085, § 5, at 310, Laws of Fla.[13]
In its final judgment, the trial court reached this conclusion in describing the transfer of the Authority's function:
A. Hospital Corporation is not performing a ... function that the Authority would otherwise perform because the Authority chose to divest itself of the operation of the functions performed by its facilities by leasing same to the Hospital Corporation....
B.... The Authority is no longer in the hospital business. Its governmental function now is to see to it that certain levels of health care are delivered to residents within its jurisdiction by contracting with others to provide these services.
Summary Final Judgment, Record on Appeal at 491-92 (emphasis added).
We conclude that the trial judge came to an erroneous decision as to the legal effect of this factual finding. The legal effect of this total transfer to West Volusia, Inc. of the Authority's statutorily authorized function to operate and maintain hospitals was in reality a delegation of the authorized function to West Volusia, Inc. Therefore, in performing pursuant to the Agreement transferring the authorized function, West Volusia, Inc. was "acting on behalf of" the Authority.
West Volusia, Inc. argues that requiring it to provide public records access would frustrate the legislative purpose of section 155.40, Florida Statutes (1993). However, we note that section 155.40 contains no express exemption from public records access. We will not imply such an exemption. Rather, we believe that an exemption from public records access is available only after the legislature has followed the express procedure provided in article I, section 24(c) of the Florida Constitution.[14]
As a matter of public policy, we find that public records access applies under the circumstances of this case. The Authority's assets were developed through the use of statutorily authorized government powers of eminent domain, bond issuance, and taxation. Public scrutiny of these assets should continue as long as the Authority owns these assets[15] or until such time as the legislature has enacted an exemption pursuant to the specific procedures required by article I, section 24(c) of the Florida Constitution.
We continue to recognize the difficulty inherent in making a determination as to whether a private actor is "acting on behalf of a public agency." As we did in New York Times Co. v. PHH Mental Health Services, Inc., 616 So.2d 27, 30 (Fla.1993), we state that private entities should look to the factors announced in Schwab to determine their possible agency status under chapter 119, Florida Statutes (1997), and under article I, section 24(a) of the Florida Constitution.
*381 We likewise agree with the Fifth District in this case in noting the distinction between providing materials or services to a public body to facilitate the public body's own performance of its public function and an agreement under which a private actor performs the public function in place of the public body. When the agreement transfers the actual public function, public access follows, as was correctly determined by the Fifth District in its more recent decision in Stanfield v. Salvation Army, 695 So.2d 501 (Fla. 5th DCA 1997), in which the district court held that public access was required for a private entity that completely assumed a governmental obligation in its contract with a county government to provide probationary services. Id. at 502-03.
We also reject West Volusia, Inc.'s contention that the Fifth District applied an incorrect standard of review. West Volusia, Inc. contends that our decision in Trepal v. State, 704 So.2d 498 (Fla.1997), dictates the standard of review that the Fifth District should have used. In Trepal, we affirmed the trial court's denial of a death-sentenced defendant's motion, in connection with a collateral challenge to his sentence, to gain access to records allegedly in the possession of a private corporation, the Coca-Cola Company. Id. at 498. After analyzing the request under the Schwab factors, the trial court in Trepal found that Coca-Cola was not acting on behalf of a public agency when it cooperated with law enforcement authorities investigating the murder. Id. at 499. We found that the trial court's application of the Schwab "totality of factors" test in Trepal's case turned primarily on a series of factual determinations. Id. Therefore, we held that, as to the resolution of the facts in Trepal, we were "precluded from substituting our judgment for that of the trial court." Id.
We reject West Volusia, Inc.'s contention that our decision in Trepal precludes the review of the Schwab factors in the manner in which the district court performed its review in this case. The Trepal case is distinguished because facts are not at issue in this controversy. In this case, the trial court decided the case on the cross-motions for summary judgment, finding no material facts in dispute. The essential determinations were based upon the trial court's and district court's legal interpretations of the Agreement.
The "totality of factors" test under Schwab presents a mixed question of fact and law. In Alamo Rent-A-Car, Inc. v. Mancusi, 632 So.2d 1352 (Fla.1994), we approved the Second District's similar analysis as follows:
In an action for malicious prosecution, the question of probable cause is a mixed question of law and fact. When the facts relied on to show probable cause are in dispute, their existence is a question of fact for the determination of the jury; but their legal effect when found or admitted to be true, is for the court to decide as a question of law.
Alamo Rent-A-Car, Inc. at 1357 (quoting Cold v. Clark, 180 So.2d 347, 349 (Fla. 2d DCA 1965)). Thus, the Fifth District correctly reviewed the legal effect of the undisputed facts in this case.
The Fifth District's review was the same as the analysis performed by the Second District in Sarasota Herald-Tribune Co. v. Community Health Corp., 582 So.2d 730 (Fla. 2d DCA 1991), in reviewing an application of the Public Records Law to a not-for-profit corporation expressly created to further the interests of a public hospital and to perform various important functions previously performed by the public hospital. Id. at 733. In Sarasota Herald-Tribune, the Second District stated, "We find no fault with the trial court's findings of fact. We conclude, however, that the trial court misapplied our decision in Fox v. News-Press Publishing Co., 545 So.2d 941 (Fla. 2d DCA 1989), when it decided that the corporation was not acting on behalf of the Board." Id. at 733.
In Sarasota Herald-Tribune, the Second District went on to set forth the factors that this Court adopted the following year in Schwab. In our Schwab opinion, we approved Sarasota Herald-Tribune. Likewise, in this case we approve the Fifth District's review of the trial court's legal conclusions based upon undisputed facts.
*382 Finally, West Volusia, Inc. contends that we should find that the First District's decision in Campus Communications, Inc. v. Shands Teaching Hospital & Clinics, Inc., 512 So.2d 999 (Fla. 1st DCA 1987), applies to this case. West Volusia, Inc. argues that if Shands Teaching Hospital and Clinics, Inc., is not bound by the Public Records Act, then West Volusia, Inc. should not be bound by the Public Records Act. We do not agree. In Shands, the First District relied on the legislative enactment that created Shands Teaching Hospital to conclude that Shands is not a state agency or authority for purposes of the Sunshine Law or Public Records Act. That determination by the First District is not relevant here. Therefore, we neither disturb nor apply it. In sum, we approve the Fifth District's decision holding that article I, section 24(a) is applicable to the performance of the Agreement by West Volusia, Inc.

OPEN MEETINGS
We also agree with the Fifth District that West Volusia, Inc. in performing and carrying out the obligations of the Agreement, is subject to the open-meetings requirements of article I, section 24(b), and the Sunshine Law.
In asserting that section 24(b) does not apply, West Volusia, Inc. points out that there is a difference between section 24(a), pertaining to public records, and section 24(b), pertaining to open meetings. The open meetings provision in section 24(b) does not use the "acting on behalf of" language used in section 24(a), the public records provision.[16] Rather, the open meetings provision in section 24(b) designates "any collegial public body of the executive branch of state government or of any collegial public body of a county, municipality, school district or special district" as subject to the open meetings requirement. Likewise, in section 286.011(1), Florida Statutes (1993), the Sunshine Law designates "any board or commission of any state agency or authority or of any agency or authority of any county, municipal corporation or political subdivision" as subject to the open meetings requirement. In construing section 286.011 in City of Miami Beach v. Berns, 245 So.2d 38 (Fla.1971), we stated that "[t]he Legislature intended to extend application of the `open meeting' concept so as to bind every `board or commission' of the state, or of any county or political subdivision over which [the legislature] has dominion or control." Id. at 40. West Volusia Inc. asserts that by this statement we set up a dominion and control test for determining whether the Sunshine Law applies to a particular organization. News-Journal responds that the legislature actually added the "acting on behalf of language in an amendment to the original Public Records Act, see ch. 75-225, § 3, at 638, and that the added language was imported from our decision in Town of Palm Beach v. Gradison, 296 So.2d 473 (Fla.1974). In Gradison, we decided that a citizens' planning commission established by the town council with members appointed by the town council was subject to the Sunshine Law. In our decision, we held:
[T]he zoning ordinance adopted by the zoning authorities and the Town Council after public hearing was rendered invalid because of the non-public activities of the citizens planning committee, which committee was established by the Town Council, active on behalf of the Council in an advisory capacity and participated in the formulation of the zoning plan.
Gradison, 296 So.2d at 478 (emphasis added). News-Journal contends that after Gradison the legislature inserted this same "acting on behalf of language into the Public Records Act to conform that statute to this Court's interpretation of the Sunshine Law. News-Journal continues with the assertion that this Court reaffirmed Gradison in Wood v. Marston, 442 So.2d 934 (Fla.1983), in which this Court held that a university's search and screening committee was covered by the Sunshine Law.
The Fifth District agreed with the News-Journal and held:
Since someone "acting on behalf of a public body is authorized to transact or discuss public business, we believe that such language is implicit in this provision and that the meetings of such surrogate public bodies *383 come under the constitutional open meetings requirement. See generally Town of Palm Beach v. Gradison. The Sunshine Law should be construed most liberally in favor of its applicability. See Wood v. Marston.

News-Journal Corp., 695 So.2d at 422 (citations omitted).
We agree that the Sunshine Law applies to West Volusia, Inc.'s performance of the Agreement. However, we do not abandon the Berns dominion and control test for factual situations similar to the one presented in Berns. There, this Court used the test to determine that a city council could not exclude the public from "informal executive sessions" during which the council discussed matters related to city government. Berns, 245 So.2d at 40. Nor do we engraft the "acting on behalf of phrase from article I, section 24(a) into section 24(b), as the Fifth District's opinion has done. We do not foreclose the possibility that a factual situation could exist in which only section 24(a) or only section 24(b) would apply. We do not find it necessary to reach that issue in this case.
Rather, we simply find that the Authority's delegation of the performance of its public purpose to West Volusia, Inc. is similar to the delegation of official acts by Marston that caused the search and screening committee in Wood to come within section 286.011, Florida Statutes (1979). Wood, 442 So.2d at 939. We conclude that our holding in Wood should be used in this situation and is appropriate in construing article I, section 24(b) of the Florida Constitution.

SECTION 395.3036, FLORIDA STATUTES (SUPP.1998)
We recognize that the 1998 Legislature enacted chapter 98-330, sections 1-4, Laws of Florida, codified at section 395.3036, Florida Statutes (Supp.1998), which became effective May 30, 1998.[17] By express provision, *384 this Act was made applicable to existing leases entered into pursuant to section 155.40, Florida Statutes. During the course of our deliberations in this case, we requested that petitioner and respondent submit to this Court briefs addressing the applicability of this newly enacted statute to our decision. Respondent's submission argues that we should hold in this opinion that this newly enacted statute is facially unconstitutional because it creates exemptions from article I, section 24(a) and (b) but fails to meet the constitutional criteria for such exemptions pursuant to article I, section 24(c). Petitioner argues that this Court does not have original jurisdiction over the constitutionality of newly enacted statutes and therefore contends that we cannot rule upon the constitutionality of the statute in the decision now before us. Petitioner further argues that if this Court considers the statute, it should be considered as a clear statement by the legislature of the intent that the Fifth District's decision should be reversed.
We have determined that we should not decide the facial constitutionality of section 395.3036, Florida Statutes, in the present decision. Rather, we conclude that a constitutional challenge to this statute should follow usual procedures, with the challenge initially proceeding in the circuit court just as the constitutional challenge involving section 395.3035(4), Florida Statutes (1997), proceeded. See Halifax Hospital Medical Center v. News-Journal Corporation, 701 So.2d 434 (Fla. 5th DCA 1997), aff'd, No. 92,047, 724 So.2d 567 (Fla.1999). In any event, we reject the contention that the amended statute shall apply retroactively.

CONCLUSION
We hold that West Volusia, Inc. in performing and carrying out the provisions and obligations of the Agreement, was subject to article I, section 24(a) and (b) of the Florida Constitution at the time of the requests for records and access to meetings which were the basis for the declaratory action. Accordingly, for the reasons stated in this opinion, we approve the decision of the district court.
It is so ordered.
HARDING, C.J., SHAW, ANSTEAD and PARIENTE, JJ., and KOGAN, Senior Justice, concur.
OVERTON, Senior Justice, dissents with an opinion.
OVERTON, Senior Justice, dissenting.
I dissent. The majority opinion ignores clear legislative policy concerning health care in this state and, in so doing, has left every nonprofit hospital entity that leases facilities from a public entity in a precarious position. In reality, this holding, together with the Court's holding in Halifax Hospital Medical Center v. News-Journal Corp., No. 92,047, 724 So.2d 567 (Fla.1999), will be the death knell of the legislative scheme to level the playing field between not-for-profit hospitals and for-profit hospitals. The beneficiaries of these decisions are not the public or the media; the clear beneficiaries are the profit-making hospitals.
The legislative mandate and purpose under the statutory leasing scheme and the statutory exemption statute are to allow not-for-profit hospitals to compete in their respective markets with profit-making hospitals. Interestingly, under today's decision, the chief executive officers of profit-making institutions will be able to attend all meetings where decisions of nonprofit hospital entities *385 are made; but, of course, the chief executive officers of the nonprofit hospital entities will not have that same opportunity to attend the meetings of profit-making institutions. Further, chief executive officers of for-profit hospitals can enter into contracts with partnerships and professional associations without having to make public disclosure of those contracts, but nonprofit hospitals entering into similar agreements will be subject to public records disclosure. This will jeopardize the ability of nonprofit hospital entities to compete with profit-making hospitals.
The history of legislation in this area reflects consistent efforts on the part of the legislature to level the playing field between nonprofit and profit-making hospitals. Prior to 1970, no true profit-making hospital entities existed. Hospital taxing districts were initially created to provide necessary community hospitals.[18] When profit-making hospitals began entering the marketplace in the late 1970s, the legislature authorized the leasing of community hospitals to nonprofit entities. It did so because it recognized that health care needs had to be met in local communities. It also recognized that nonprofit hospitals needed to be able to compete with the for-profit hospitals. Otherwise, nonprofit hospitals might not be able to remain open to the citizens of their respective communities or to provide indigent care in those communities. Accordingly, in 1982, the legislature provided nonprofit hospitals with the authority to enter into leases with other not-for-profit corporations by enacting section 155.40, which provided, in part:

In order that citizens and residents of the state may receive quality health care, any county, district, or municipal hospital organized and existing under the laws of this state, acting by and through its governing board, shall have the authority to convert such hospital to a nonprofit Florida corporation, and enter into contracts with nonprofit Florida corporations for the purpose of operating and managing such hospital and any or all of its facilities of whatsoever kind and nature; to enter into leases with a nonprofit Florida corporation for the operating of such facilities so existing.
§ 155.40(1), Fla. Stat. (Supp.1982) (emphasis added). Shortly before this provision was implemented, the legislature also authorized the leasing of the Shands Teaching Hospital and Clinics to a nonprofit entity. See ch. 79-248, Laws of Fla. (codified as § 240.513, Fla. Stat. (1997)).
The Fifth District Court of Appeal's decision in this case did not recognize or discuss the public necessity and purpose behind the legislative leasing scheme of public nonprofit hospitals. As a result of that decision, the legislature immediately addressed this issue and enacted chapter 98-330, Laws of Florida. In doing so, the legislature expressly provided that it was enacting the legislation because of the Fifth District's decision now under review. The legislature noted that the Fifth District had changed existing case law and that the problems created by the decision "pose[d] a significant threat to the continued viability" of nonprofit hospitals. The full text of the legislation along with the supporting legislative findings and intent as taken from chapter 98-330 is as follows:
Section 1. Section 395.036, Florida Statutes, is created to read:
395.3036 Confidentiality of records and meetings of corporations that lease public hospitals or other public health care facilities.The records of a private corporation that leases a public hospital or other public health care facility are confidential and exempt from the provisions of s. 119.07(1) and s. 24(a), Art. I of the State Constitution, and the meetings of the governing board of a private corporation are exempt from s. 286.011 and s. 24(b), Art. I of the State Constitution when the public lessor complies with the public finance accountability provisions of s. 155.40(5) with respect to the transfer of any public funds to the private lessee and when the private lessee meets at least three of the five following criteria:
(1) The public lessor that owns the public hospital or other public health care facility was not the incorporator of the *386 private corporation that leases the public hospital or other health care facility.
(2) The public lessor and the private lessee do not commingle any of their funds in any account maintained by either of them, other than the payment of the rent and administrative fees or the transfer of funds pursuant to subsection (2).
(3) Except as otherwise provided by law, the private lessee is not allowed to participate, except as a member of the public, in the decisionmaking process of the public lessor.
(4) The lease agreement does not expressly require the lessee to comply with the requirements of s. 119.07(1) and s. 286.011.
(5) The public lessor is not entitled to receive any revenues from the lessee, except for rental or administrative fees due under the lease, and the lessor is not responsible for the debts or other obligations of the lessee.
Section 2. (1) The Legislature finds that it is a public necessity that all records of a private corporation and all meetings of the governing board of the private corporation be confidential and exempt from the public records and public meeting laws of this state when the private corporation leases a public hospital or other public health care facility from a public entity in accordance with the terms of this act. The Legislature further finds that private corporations have entered into such leases in reliance on the legal standard governing the application of the public records and open meeting laws to such lease agreements which was set forth in case law existing at the time of the transaction. That standard provided that such private lessees were not "acting on behalf of" the public entity and, therefore, not subject to the state's public records laws so long as the public entity did not retain control over the private lessee. No one factor was used to determine whether the public entity exerted control; instead a "totality of factors" was analyzed and the decision made on the balance of those factors. In a recent decision, however, the Fifth District Court of Appeal has now applied the standard in a manner that may cause more lessees to be subject to public records and meetings requirements. The Legislature finds that the effect of the decision has been:

(a) To create uncertainty with respect to the status of records and meetings under existing lease arrangements; and
(b) To create a disincentive for private corporations to enter into such lease agreements in the future.

(2) Public entities have chosen to privatize the operations of their public hospitals and public health care facilities in order to alleviate three problems that pose a significant threat to the continued viability of Florida's public hospitals:

(a) A financial drain on the facilities from their forced participation in the Florida Retirement System;

(b) The competitive disadvantage placed on these facilities vis a vis their private competitors resulting from their required compliance with the state's public records and public meeting laws; and
(c) State constitutional restrictions on public facility participation in partnerships with private corporations as a result of the limitations contained in the State Constitution. For years, the Legislature has approved and encouraged these leases, first through special acts that it has adopted authorizing the lease agreements and, more recently, through the adoption of section 155.40, Florida Statutes, which provides for the conversion of public hospital facilities to private operation by lease, as a means to provide public entities with the necessary flexibility to use these public assets in a manner that best serves the interests of the public. Through such lease arrangement, public entities have been able to obtain substantial and oftentimes desperately needed private capital investment into these facilities and to relieve the oftentimes burdensome drain on public tax revenues which resulted from public operation.

*387 (3) In the absence of a defined and, therefore, predictable statewide standard for determining when the public records and public meetings laws apply to future lease agreements, public entities may find it difficult, if not impossible, to find a private corporation that is willing to enter into a lease to operate the public hospital or other public health care facility. This, in turn, could force the public entity:
(a) To close the hospital or other health care facility, which would result in a reduction in health care services to the public;
(b) To sell the hospital or other health care facility, which sale, if the facility has deteriorated because of inadequate capital investments over time, will likely be at a loss; or
(c) To continue operating the hospital or other health care facility using public tax dollars to subsidize recurring losses. None of these options is in the best interest of the public.
(3) The Legislature, therefore, finds that it is a public necessity for it, through this act, to clarify when the public records and public meeting laws apply to private lessees of public hospital or other public health care facilities. The Legislature further finds that it is a public necessity for these private lessees to be exempt from the public records and public meetings laws of the state so long as, applying the standard codified by this act, the public entity does not retain control over the private entity.
Section 3. This act does not change existing law relating to discovery of records and information that are otherwise discoverable under the Florida Rules of Civil Procedure or any statutory provision allowing discovery or pre-suit disclosure of such records and information for the purpose of civil actions.
Section 4. This act shall take effect [May 30, 1998] and shall apply to existing leases and future leases of public hospitals and other health care facilities.
(Emphasis added.) Through this legislation, the legislature clearly stated that "the records of a private corporation that leases a public hospital or other public health care facility are confidential and exempt." The legislature also stated that "it is a public necessity that all records of a private corporation and all meetings of the governing board of the private corporation be confidential and exempt." Further, the legislature explained its action by stating that "the Fifth District Court of Appeal has now applied the standard in a manner that may cause more lessees to be subject to public records and meeting requirements." Finally, it is also important to note that the legislature expressly provided that this law "shall apply to existing leases and future leases of public hospitals and other health care facilities." (Emphasis added.)
This legislation became law on May 30, 1998, which was during the time this case was pending. The legislation was passed in accordance with the provisions of article I, section 24(c), of the Florida Constitution, which authorizes the legislature to pass a general law exempting records from the requirements of the Florida Public Records Law and exempting meetings from the requirements of Florida's Sunshine Law. Article I, section 24(c), provides that "such law shall state with specificity the public necessity justifying the exemption and shall be no broader than necessary to accomplish the stated purpose of the law."
Consistent with that provision, this statute was written to comply with the specificity requirement and states with sufficient specificity the reasons for the exemption. It reflects the need for the leasing scheme created in section 155.40 and explains in its intent language, in support of section 395.3036, a clear and justifiable basis for the exemption. The statutory scheme was implemented to allow nonprofit hospitals to compete on a level playing field. Accordingly, I would find the legislation to be constitutional. By failing to rule on the constitutionality of the legislation, the majority has left all nonprofit hospitals and the private corporations with whom they deal in limbo as to whether they are subject to the public meetings and records disclosures.
*388 Further, I would not only find the statute to be constitutional; I would also find that the statute applies retrospectively to the instant case. I recognize the general rule that a substantive statute will not operate retrospectively unless clear legislative intent exists to make the statute retrospective. However, the legislature clearly intended for the statute at issue to apply retrospectively. The statute was passed in direct response to the Fifth District's decision, and the statute itself says that it applies to all existing leases. Because the lease in this case existed at the time the statute was implemented, I would find that the statute must apply in this case.
It is apparent that, in enacting this statute, the legislature was concerned that, because of the Fifth District's decision, the law was now uncertain and that the decision would substantially and adversely affect nonprofit health care facilities. As noted by the legislature, parties had entered into these types of leases with the understanding that they would be private and confidential. Clearly, the legislature was concerned about parties terminating the leases because of the Fifth District's decision. Equally clear, the legislature wanted nonprofit hospital entities to be able to compete with profit-making hospitals. In its findings, the legislature expressed concern about whether nonprofit hospital entities operating the type of hospitals at issue would be willing to continue to accept responsibility for the operation of those hospitals when placed under the public record requirements resulting from the Fifth District's decision.
I strongly believe that this Court has an obligation to the citizens of this state to send a message to the hospital community of what that community is mandated to do in the operation of these leased nonprofit hospital entities. Nowhere in the majority opinion does this Court discuss how its decision will apply to other institutions that have entered into this type of leasing agreement. Apparently, all nonprofit hospital entities operating under leases entered into prior to the adoption of the new legislation are now subject to open meetings and open records laws. However, the majority opinion does not specifically hold that this is so. Moreover, until the constitutionality of the new legislation is ruled upon, hospital entities will be unsure of their status in this regard. We also have two decisions of appellate courts of this state holding that Shands is not required to comply with the public records and public meetings law, which is inconsistent with the majority holding in this case. At a minimum, this Court should make a clear statement as to which cases involving this subject matter are still good law. Partnerships, professional associations, corporations, and individuals who enter into agreements with these hospitals need to know how this decision affects them in their dealings with these hospital entities.
In conclusion, I find that this Court, by today's decision, has unjustifiably overruled a major legislative policy decision without considering the constitutionality of the legislative action. We should either uphold the statute or declare it to be unconstitutional.
NOTES
[1] Article I, section 24 of the Florida Constitution provides in relevant part:

(a) Every person has the right to inspect or copy any public record made or received in connection with the official business of any public body, officer, or employee of the state, or persons acting on their behalf, except with respect to records exempted pursuant to this section or specifically made confidential by this Constitution....
(b) All meetings of any collegial public body of the executive branch of state government or of any collegial public body of a county, municipality, school district, or special district, at which official acts are to be taken or at which public business of such body is to be transacted or discussed, shall be open and noticed to the public....
[2] Section 155.40, Florida Statutes (1993), provides in relevant part:

(1) In order that citizens and residents of the state may receive quality health care, any county, district, or municipal hospital organized and existing under the laws of this state, acting by and through its governing board, shall have the authority to reorganize such hospital as a not-for-profit Florida corporation, and enter into contracts with not-for-profit Florida corporations for the purpose of operating and managing such hospital....
[3] Ch. 119, Fla. Stat. (1993).
[4] Ch. 286, Fla. Stat. (1993).
[5] In Schwab, this Court set forth the following nonexclusive list of factors for determining whether an organization is subject to the Public Records Act:

1) The level of public funding; 2) commingling of funds; 3) whether the activity was conducted on publicly owned property; 4) whether services contracted for are an integral part of the public agency's chosen decision-making process; 5) whether the private entity is performing a governmental function or a function which the public agency otherwise would perform; 6) the extent of the public agency's involvement with, regulation of, or control over the private entity; 7) whether the private entity was created by the public agency; 8) whether the public agency has a substantial financial interest in the private entity; and 9)for whose benefit the private entity is functioning.
Schwab, 596 So.2d at 1031.
[6] The taxing authority of the district has a fivemill ad valorem tax cap, and "[i]n 1995, 1994, and 1993, the operating millage was 2.53260, 2.62500 and 2.95351, and the taxes levied [were] $9,731,050, $9,806,717 and $10,681,107, respectively." Fla. H.R. Comm. on Health Care, A Study of Hospital Districts app. at 34 (1996) (hereinafter Report).
[7] The legislature amended this section in 1996 to permit such taxing districts to sell or lease their hospital facilities to for-profit or to not-for-profit Florida corporations and to enter into leases or other contracts with for-profit or not-for-profit Florida corporations for the purpose of operating and managing such hospitals. Ch. 96-304, § 1 at 1377, Laws of Fla. (codified at § 155.40, Fla. Stat. (Supp.1996)).
[8] "Working Capital Assets" are defined in the Agreement as

cash and cash equivalents, accounts receivable, net of allowances for doubtful accounts and contractual adjustments, other receivables which are expected to be collected within one year in the normal business cycle, inventories, prepaid expenses, any funded depreciation and other funds designated for capital improvements, notes receivable and other investments which are not restricted by third parties, and receivables from related parties which are expected to be liquidated in the form of cash and cash equivalents, but excluding all assets financed through long term debt or other long term liabilities.
Record on Appeal at 877-78.
[9] "Operating Assets" are defined as

those assets which are owned by Lessor in connection with the operations of the Existing Facilities excluding (i) the Existing Facilities, (ii) to the extent committed prior to September 30, 1994 for other than the use or the support of the Existing Facilities, all ad valorem tax revenues collected by Lessor, (iii) those assets held in Lessor's self insurance fund(s), and (iv) those assets set forth in Schedule 1.27 attached hereto, (the foregoing items (ii), (iii) and (iv) collectively referred to as the "Excluded Assets") but including, without limitation:
(a) all Assigned Contracts;
(b) all books, records and other information
. . .
(c) all judgments, choses in action and intangibles owned by Lessor ...
(d) the name "West Volusia Memorial Hospital";
(e) all assets restricted by a third party for a particular use;
(f) all permits, licenses, filings, certificates of need, authorizations, approvals or indicia of authority ... held by Lessor with respect to the ownership or operation of the Existing Facilities, to own, construct, operate, or maintain any fixture, facility, equipment, vehicle, machinery, or installation of the Existing Facilities... and
(g) all assets of Lessor not listed above utilized in Existing Facilities Operations that are not otherwise classified as Existing Facilities or Working Capital Assets or that are not Excluded Assets.
Id. at 874.
[10] "Existing Facilities Operations" are defined as

all of the hospital, health care, administrative and related activities conducted as of the Commencement Date hereof or in the past by Lessor in the ordinary course of owning and operating the Existing Facilities. Upon the transfer of the Existing Facilities operations to Lessee pursuant to Section 2.02 hereof, the term "Existing Facilities Operations" shall mean all of the hospital, health care, administrative and related activities conducted by Lessee in the ordinary course of leasing and operating the Existing Facilities during the Term of this Agreement.
Id. at 873.
[11] Deposition of David Raines, Record on Appeal Vol. 5 at 13.
[12] On October 28, 1992, almost two years before the signing of the Authority's West Volusia Memorial agreement, the Authority had entered into a financing and development agreement with Adventist Health System/Sunbelt, Inc., for the joint development of an inpatient and outpatient health care facility, Volusia Medical Center. The new corporation, Southwest Volusia Healthcare Corporation, is owned equally by the Authority and Adventist. In 1994, existing inpatients of the Authority's Fish Memorial Hospital were transferred to the new hospital, and the old facility was taken out of service. Report, app. at 34.
[13] The special act has been amended several times. See ch. 67-2152, at 4604, Laws of Fla.; ch. 82-383 at 393, Laws of Fla.; ch. 88-473 at 89, Laws of Fla. Although these amendments modified the original act, none substantially changed the mission or jurisdiction of the hospital authority.
[14] Article I, section 24(c) of the Florida Constitution provides in relevant part:

The legislature, however, may provide by general law for the exemption of records from the requirements of subsection (a) ... provided that such law shall state with specificity the public necessity justifying the exemption and shall be no broader than necessary to accomplish the stated purpose of the law.
[15] The 1996 amendment to section 155.40, Florida Statutes, authorizes special taxing districts to sell their hospitals for "fair market value." § 155.40(4)(b), Fla. Stat. (Supp.1996). See supra note 7.
[16] See supra note 1.
[17] Chapter 98-330, sections 1 and 2, Laws of Florida, provide in relevant part:

Section 1. Section 395.3036, Florida Statutes, is created to read:
395.3036 Confidentiality of records and meetings of corporations that lease public hospitals or other public health care facilities. The records of a private corporation that leases a public hospital or other public health care facility are confidential and exempt from the provisions of s. 119.07(1) and s. 24(a), Art. I of the State Constitution, and the meetings of the governing board of a private corporation are exempt from s. 286.011 and s. 24(b), Art. I of the State Constitution when the public lessor complies with the public finance accountability provisions of s. 155.40(5) with respect to the transfer of any public funds to the private lessee and when the private lessee meets at least three of the five following criteria:
(1) The public lessor that owns the public hospital or other public health care facility was not the incorporator of the private corporation that leases the public hospital or other health care facility.
(2) The public lessor and the private lessee do not commingle any of their funds in any account maintained by either of them, other than the payment of the rent and administrative fees or the transfer of funds pursuant to subsection (2).
(3) Except as otherwise provided by law, the private lessee is not allowed to participate, except as a member of the public, in the decisionmaking process of the public lessor.
(4) The lease agreement does not expressly require the lessee to comply with the requirements of s. 119.07(1) and s. 286.011.
(5) The public lessor is not entitled to receive any revenues from the lessee, except for rental or administrative fees due under the lease, and the lessor is not responsible for the debts or other obligations of the lessee.
Section 2. (1) The Legislature finds that it is a public necessity that all records of a private corporation and all meetings of the governing board of the private corporation be confidential and exempt from the public records and public meeting laws of this state when the private corporation leases a public hospital or other public health care facility from a public entity in accordance with the terms of this act. The Legislature further finds that private corporations have entered into such leases in reliance on the legal standard governing the application of the public records and open meeting laws to such lease agreements which was set forth in case law existing at the time of the transaction. That standard provided that such private lessees were not "acting on behalf of" the public entity and, therefore, not subject to the state's public records laws so long as the public entity did not retain control over the private lessee. No one factor was used to determine whether the public entity exerted control; instead a "totality of factors" was analyzed and the decision made on the balance of those factors. In a recent decision, however, the Fifth District Court of Appeal has now applied the standard in a manner that may cause more lessees to be subject to public records and meetings requirements. The Legislature finds that the effect of the decision has been:
(a) To create uncertainty with respect to the status of records and meetings under existing lease arrangements; and
(b) To create a disincentive for private corporations to enter into such lease agreements in the future.
(2) Public entities have chosen to privatize the operations of their public hospitals and public health care facilities in order to alleviate three problems that pose a significant threat to the continued viability of Florida's public hospitals:
(a) A financial drain on the facilities from their forced participation in the Florida Retirement System;
(b) The competitive disadvantage placed on these facilities vis a vis their private competitors resulting from their required compliance with the state's public records and public meeting laws; and
(c) State constitutional restrictions on public facility participation in partnerships with private corporations as a result of the limitations contained in the State Constitution.
[18] In 1957, the legislature created West Volusia Hospital Authority, a special taxing district, and authorized the district to establish the hospital in this case.