695 So.2d 418 (1997)
NEWS-JOURNAL CORPORATION, Appellant,
v.
MEMORIAL HOSPITAL-WEST VOLUSIA, INC., etc., Appellee.
No. 96-2608.
District Court of Appeal of Florida, Fifth District.
May 16, 1997.
*419 Jonathan D. Kaney, Jr. and Jonathan D. Kaney, III of Cobb, Cole & Bell, Daytona Beach, for Appellant.
David A. Monaco and Larry R. Stout of Monaco, Smith, Hood, Perkins, Loucks & Stout, Daytona Beach, for Appellee.
Neil H. Butler, of Butler & Long, and Teresa Clemmons Nugent, Tallahassee, Amicus Curiae for Association of Voluntary Hospitals of Florida, Inc.
William A. Bell, Tallahassee, Amicus Curiae for Florida Hospital Association, Inc.
PER CURIAM.
The News-Journal Corporation timely appeals from a final summary judgment determining that neither the Public Records Act nor the Sunshine Law applies to records of Memorial Hospital-West Volusia, Inc. We reverse.
West Volusia Hospital Authority (Authority) was created for and charged with the responsibility pursuant to its enabling act "to establish, construct, operate and maintain such hospital or hospitals as ... shall be necessary for the use of the people of the district. Such hospital or hospitals shall be... operated and maintained ... for the preservation of the public health, and for the public good and for the use of the public of said district; and the maintenance of such hospital ... is hereby found and declared to be a public purpose and necessary for the preservation of the public health and for the public use and for the welfare of said district and inhabitants thereof."[1]
To carry out this mandate, the Authority was given the power to levy and collect taxes from such inhabitants. Over the years, a considerable amount of tax money was levied, collected. and used to build, furnish and equip the West Volusia Memorial Hospital.
*420 When the Authority proved incapable of operating the hospital in a fiscally responsible manner (it was having to rely more and more on the taxpayers to finance even the operation of the hospital), it decided that its responsibility to provide hospital services to its constituents would best be served by having the hospital operated by Memorial Hospital-West Volusia, Inc. (Lessee). It therefore entered into a Lease and Transfer Agreement with Lessee so that its constituents would continue to have access to the same hospital, now operated by a not-for-profit company. In a broad, general sense, Lessee was acting "on behalf of" the Authority in continuing to fulfill the Authority's responsibility to provide hospital services to its constituents.
We recognize that both parties to this lease and transfer arrangement intended that Lessee not face the glare of the Sunshine Law or be saddled by the requirements of the Public Records Law. The agreement was carefully drafted in order to accomplish this end. The issue before us is whether the parties were successful. We think not. This is not a reflection on the abilities of the very capable lawyers employed by the parties. They did the best they could. But they were burdened by the circumstances of the case and the constitutional and statutory law of the state.
In deciding issues relating to constitutional obligations, we should first, of course, refer to the applicable constitutional provision. Article I, Section 24, Florida Constitution, provides that the public has the right to review the records of any public body "or persons acting on their behalf" and that any meeting of a public body in which public business is discussed or transacted shall be open to the public. But even though, as stated above, Lessee, broadly speaking, is acting on behalf of the Authority, the supreme court has held that since everyone that contracts with a public body is not acting "on behalf of" that public body in the sense contemplated by the constitution, certain factors should be considered in determining whether a particular contractor's records are subject to disclosure. See News and Sun-Sentinel Co. v. Schwab, Twitty & Hanser Architectural Group. Inc., 596 So.2d 1029 (Fla.1992).
We recognize that in contracting "with" a public body, the contracting party may commit to provide material or services to the public body or in place of the public body. There is, of course, a major distinction between the two.
If one merely undertakes to provide materialsuch as police cars, fire trucks, or computersor agrees to provide servicessuch as legal services, accounting services, or other professional servicesfor the public body to use in performing its obligations, then there is little likelihood that such contractor's business operation or business records will come under the open meetings or public records requirements. On the other hand, if one contracts to relieve a public body from the operation of a public obligationsuch as operating a jail or providing fire protection and uses the same facilities or equipment acquired by public funds previously used by the public body then the privatization of such venture to the extent that it can avoid public scrutiny would appear to be extremely difficult, regardless of the legal skills lawyers applied to the task.
Two cases are illustrative. First, the supreme court's Schwab decision. In Schwab, the architect was clearly providing services to the School Board and was not providing a service in place of the School Board. The architectural design of a school facility is not something that the School Board would normally do or, so far as the record reflects, had ever done. The School Board used the result of the architect's services in order to fulfill its obligation to build and operate school facilities. Thus, the meetings of the architectural firm remained private and its records were not subject to public inspection. The contrasting case is Schwartzman v. Merritt Island Volunteer Fire Department, 352 So.2d 1230 (Fla. 4th DCA 1977). There, the volunteers were providing fire protection in place of the county. The county provided the facility and equipment and contributed a portion of the funds for the operation. And had the volunteers not stepped forward, the county would have been required to provide some, even if not as good, fire protection for the *421 inhabitants of the area. Therefore, the volunteers were deemed to be "acting on behalf" of the county and their meetings and records were open to public scrutiny.
Let's analyze the Schwab factors in relation to the case before us to see if Lessee was providing hospital services in place of the Authority.
Did the Authority "create" Lessee? Lessee's position is that it is a not-for-profit company whose charter was prepared and submitted by Memorial Health Systems, Inc., its parent company. While it is true that the Authority had nothing to do with the physical acts involved in incorporating Lessee, we do not believe that such acts are what the supreme court had in mind in listing this factor. Certainly, the Authority played a role in Lessee's formation because it required its formation in order to transact this venture. In considering whether to lease, the Authority chose to proceed under Section 155.40, Florida Statutes, which required the formation of a not-for-profit corporation.[2] Therefore, even if the Authority did not prepare and send the charter to Tallahassee, Lessee was formed at the behest of the Authority and we believe that to be sufficient under this factor.
What is the level of public funding? Lessee contends that the Authority has little or no "required" financial investment in the venture other than, of course, providing the property which is the subject of the lease and for which the Authority receives a rental. We see a substantial public investment. The Authority has leased property (the hospital grounds and building fixtures and equipment) having a value of approximately $20,000,000 for a lease payment amortized over the life of the forty-year lease of about 1% of the property's value per year. This is like saying that a father who "leases" his $100,000 home to his son for $1,000 per year is not subsidizing the youth's income. In addition, the Authority has agreed, in its discretion, to appropriate sufficient taxpayer funds to contribute up to $10,000,000 in the first four years toward Lessee's operating budget. Lessee emphasizes that this contribution to its operation is "discretionary." We find significant only the fact that the agreement contemplates that tax money will or may be used in the operation. Additionally, the Authority transferred the Hospital's entire Working Capital fund for the use of Lessee. This appears to be a high level of public funding indeed.
Is there a commingling of funds? There is no evidence of a single bank account in which the Authority and Lessee deposit their funds, but it seems more significant to us that the funds of the Authority and the funds of Lessee are in fact "commingled" in that both are used in the payment of the hospital expenses.
Is the activity conducted on publicly owned property? The activity is conducted on public property that has been "leased" to Lessee to continue the operation of what had been a publicly operated hospital. Although the right to possession of the property has been transferred by virtue of the lease, title to the property remains vested in the Authority on behalf of the public.
Are the services contracted for an integral part of the Authority's decision-making process? Although we are not certain exactly what this factor means, we note that its lease and transfer arrangement the Authority continues operation of the hospital, thus fulfilling its responsibilities under its charter. The Authority's sole reason for existence is to see that its constituents have access to hospital services within its area. This arrangement achieves that goal.
Is Lessee performing a service that would otherwise be provided by the Authority? Most definitely. In fact, the services contemplated by this lease and transfer agreement had been performed by the Authority for several years before this agreement. If the Authority did not provide these *422 services either through a contractual arrangement with some entity or through its own management, then there would be no reason for the Authority to exist.
Does the Authority have "control" over Lessee? Admittedly the Authority has no voting board member on Lessee's Board of Directors. However, it can and does exert considerable control by virtue of the requirements of the lease and the performance standards established therein. And if there is a default in the lease or a deficiency in the standards of performance, the "lease" may be terminated. This is real control.
Does the Authority have a financial interest in Lessee? Certainly not as an investor. Nevertheless, as discussed in the level of public funding category above, it has a substantial financial interest in the venture.
For whose benefit is Lessee functioning? In a sense, of course, this is the primary issue before this court. Without doubt it is functioning in the financial interest of itself and its parent company. However, in our view, it is just as surely functioning for the benefit of the Authority in a practical sense by providing hospital services to the inhabitants of the taxing district which, but for the lease and transfer agreement, the Authority would be forced to provide.
Weighing all these factors, we conclude that indeed Lessee is acting on behalf of the Authority and is therefore subject to public records disclosure.
Even so, Lessee claims that since there is no "acting on behalf of" language in the constitutional section relating to open meetings, it should not be subject to the Sunshine open meetings requirement. We disagree. Even though the constitutional provision referred to above in our discussion of the open meeting requirement does not use the "acting on behalf of" terminology, it does require that all meetings of public bodies in which "public business of such body is to be transacted or discussed" shall be open to the public. Since someone "acting on behalf of" a public body is authorized to transact or discuss public business, we believe that such language is implicit in this provision and that the meetings of such surrogate public bodies come under the constitutional open meetings requirement. See generally Town of Palm Beach v. Gradison, 296 So.2d 473 (Fla.1974). The Sunshine Law should be construed most liberally in favor of its applicability. See Wood v. Marston, 442 So.2d 934 (Fla.1983).
REVERSED and REMANDED for further action consistent with this opinion.
W. SHARP, HARRIS and GRIFFIN, JJ., concur.
NOTES
[1] Section 5, chapter 57-2085, Laws of Florida (1957).
[2] Lessee urges that since section 155.40 was designed to foster competition, it implicitly permits agreements that are designed to avoid public record and public meeting requirements. We note, however, that the act does not expressly waive such requirements for agreements entered into pursuant to its authorization. And we do not believe that if the Legislature had intended such a result, it would have been so vague on such an important issue.