927 So.2d 961 (2006)
MEMORIAL HOSPITAL-WEST VOLUSIA, INC., Appellant/Cross-Appellee,
v.
NEWS-JOURNAL CORPORATION, et al., Appellee/Cross-Appellant.
No. 5D05-925.
District Court of Appeal of Florida, Fifth District.
March 24, 2006.
Rehearing Denied May 10, 2006.
*963 Arthur J. England, Jr., and Edward G. Guedes of Greenberg Traurig, P.A., Miami, for Appellant/Cross-Appellee.
Jonathan D. Kaney, Jr., Jonathan D. Kaney, III, and Heather Bond Vargas, Cobb & Cole, Daytona Beach, for Appellee/Cross-Appellant, News-Journal Corp.
Tanner Andrews, DeLand, pro se.
PLEUS, C.J.
We have once again been asked to determine whether the Public Records Act and Sunshine Law[1] apply to Memorial Hospital-West Volusia, Inc. ("Memorial"). We previously determined that these laws applied to Memorial when it leased a hospital from the West Volusia Hospital Authority ("the Authority"). See News-Journal v. Corp. Memorial Hosp.-West Volusia, Inc., 695 So.2d 418 (Fla. 5th DCA 1997) ("News-Journal Corp."). The supreme court approved our determination in Memorial *964 Hosp.-West Volusia, Inc., v. News Journal Corp., 729 So.2d 373 (Fla.1999) ("Memorial I").
Now that Memorial has purchased the hospital from the Authority, we conclude that these public disclosure laws no longer apply. We therefore reverse the summary judgments entered in favor of the defendants, News-Journal Corporation ("the News-Journal") and Tanner Andrews ("Andrews"), and remand with directions to enter summary judgment in favor of Memorial.

Facts
The history of the Authority, from its inception in 1957, to its prior relationship and litigation with Memorial through 1999, is chronicled at length in Memorial I. In 2000, the Authority terminated Memorial's lease and sold the hospital to a reconstituted corporate entity also known as Memorial. As consideration for the hospital, Memorial agreed to (1) forgive the Authority's unpaid debt to Memorial; (2) fully fund and terminate the hospital employee pension plan; and (3) abide by certain covenants for 20 years.
The covenants obligated Memorial to (1) maintain the hospital's JCAHO[2] accreditation and its emergency room; (2) maintain 156 licensed beds; (3) name the hospital "Florida Hospital DeLand;" (4) continue any current medical services and programs; (5) provide emergency medical care to indigents; (6) provide medical staff pursuant to the terms of the agreement; (7) create a governing board with 11 members, four of which were DeLand residents; and (8) give the Authority the right of first refusal if Memorial decided to sell the hospital.
In August 2002, Memorial filed a complaint against the News-Journal and Andrews, seeking a declaration that it was no longer subject to the Public Records Act or the Sunshine Law after the sale of the hospital in September 2000. The News-Journal and Andrews filed counter-complaints and all parties later moved for summary judgment.
Along with its motion for summary judgment, Memorial filed several supporting documents and affidavits. In its motion for summary judgment, the News-Journal conceded that "[t]here is no dispute as to any facts set forth in [Memorial's] affidavits and evidenced by the documents in [Memorial's] Appendix." Andrews disputed three issues. Andrews correctly characterized the first issue as one of law, not fact. The second issue is not material to this discussion. In the third issue, Andrews disputed Memorial's assertion that the Authority did not provide Memorial any funding other than indigent care reimbursement. Andrews alleged that "the Authority in fact provided approximately $11M since 2000 to make up for [Memorial's] failure to fund its pension plan." This assertion was unsupported by any citation to evidence in the record and none is apparent upon our review. Thus, the lower court correctly determined that summary judgment was appropriate because the material facts were undisputed.
The lower court granted summary judgment in favor of the defendants, finding that Memorial was still subject to the public disclosure laws despite the Authority's sale of the hospital to Memorial. Memorial timely appealed.
On appeal, Memorial argues that the lower court erroneously applied the "delegation" test instead of the "totality of factors" test. Memorial contends that proper application of the totality of factors test leads to the conclusion that it is no longer *965 subject to the Public Records Act and Sunshine Law.
The News-Journal argues that it was not necessary to apply the totality of factors test when there was a clear delegation of the Authority's statutory responsibility to Memorial. Andrews argues that the trial court's decision subjecting Memorial to public disclosure laws was correct under either the totality of factors test or the delegation test.
In addition, Andrews filed cross appeal arguing that that the lower court erred in concluding that Memorial's violation of the Sunshine Law in announcing its intent to terminate the lease was cured by subsequent public meetings of the Authority. Andrews argues that the violations were not cured, and consequently, the lease termination and sale were void. However, we agree with the lower court that the Authority cured the violation and therefore reject this argument without further discussion.

Standard of Review
The de novo standard applies for reviewing the lower court's decision on cross motions for summary judgment. Memorial Hospital, 729 So.2d at 381.

Constitutional and Statutory Provisions
The Public Records Act: Article I, section 24(a) of the Florida Constitution gives the public the right to inspect or copy public records of "any public body, officer or employee of the state, or persons acting on their behalf," including an "entity created pursuant to law...." (Emphasis added). Pursuant to this provision, the legislature enacted Chapter 119 of the Florida Statutes. Section 119.011(2) broadly defines the term "agency" to include any private business entity "acting on behalf of any public agency."
The Sunshine Law: Article 1, section 24(b) of the Florida Constitution requires that "[a]ll meetings of any ... special district" at which public business is transacted or discussed is to be "open and noticed to the public." Pursuant to this provision, the legislature enacted section 286.011(1), Florida Statutes, which subjects government agencies to the open meetings requirement.[3] Collectively, these provisions are referred to as the Sunshine Law.
Applicable Hospital Acts and Statutes: In 1957, the legislature created the Authority, an independent taxing district in western Volusia County that is "authorized and empowered to establish, construct, operate, and maintain such hospital or hospitals" for use of the people of the district. Ch. 57-2085, § 5 at 310, Laws of Fla. The legislature found the maintenance of such hospitals was a "public purpose" and was "necessary for the preservation of the public health and for the public use and for the welfare of said district and inhabitants thereof." Id.; see also Memorial I, 729 So.2d at 377.
In 1982, the legislature enacted section 155.40, Florida Statutes (1983), which authorized independent special taxing districts such as the Authority to enter into leases and operating agreements for existing hospital facilities with not-for-profit Florida corporations. In 1996, the legislature amended this section to permit such taxing districts to lease or sell their hospitals. *966 Ch. 96-304, § 1 at 1377, Laws of Fla.; Memorial I, 729 So.2d at 377.

Case Law
The Schwab Totality of Factors Test: In News and Sun-Sentinel Co. v. Schwab, Twitty & Hanser Architectural Group, Inc., 596 So.2d 1029 (Fla.1992) ("Schwab"), the supreme court adopted a totality of factors test for determining whether a private entity is "acting on behalf of any public agency" under the Public Records Act. The factors it considered, included but were not limited to:
1) the level of public funding; 2) commingling of funds; 3) whether the activity was conducted on publicly owned property; 4) whether services contracted for are an integral part of the public agency's chosen decision-making process; 5) whether the private entity is performing a governmental function or a function which the public agency otherwise would perform; 6) the extent of the public agency's involvement with, regulation of, or control over the private entity; 7) whether the private entity was created by the public agency; 8) whether the public agency has a substantial financial interest in the private entity; and 9) for who's benefit the private entity is functioning.
Id. at 1031.
Since Schwab, the supreme court has repeatedly advised private entities to look to the Schwab factors in evaluating their possible agency status under the Public Records Act. See Memorial Hospital, 729 So.2d at 380; New York Times Co. v. PHH Mental Health Services, Inc., 616 So.2d 27, 30 (Fla.1993).
The Delegation Test: In Stanfield v. Salvation Army, 695 So.2d 501, 503 (Fla. 5th DCA 1997), however, this Court held that where the facts compel the conclusion that a public agency has transferred or delegated its statutory responsibility to a private entity, "it is unnecessary to engage in the factor-by-factor analysis outlined by Schwab." In Stanfield, the Salvation Army contracted with Marion County to provide probationary services for misdemeanants pursuant to section 948.15, Florida Statutes. This Court held that because the Salvation Army contract provided for the "complete assumption of a governmental obligation," it was subject to the Public Records Act. Id. In so holding, this Court distinguished between merely contracting to provide services to a public agency and contracting to provide services in place of the public agency. Id. at 502-03.
In support of such a distinction, we relied upon our opinion in News-Journal Corp. However, in News-Journal Corp., we nevertheless proceeded to fully analyze the individual factors listed in Schwab and concluded that Memorial was subject to the Public Records Act under the lease agreement.
On review of the News-Journal case, the supreme court approved both our evaluation of the Schwab factors and our distinction between providing services to or in place of a public agency. It stated as follows:
We find no error in the district court's legal determinations of each factor listed in our Schwab decision. However, as we made clear in Schwab, an analysis of the individual factors we listed in Schwab "provides guidance for making such a determination," but it is the totality of factors that controls the determination. Schwab, 596 So.2d at 1031-32.
In this case, the totality of factors demonstrates that the authorized function of the Authority has been transferred and thereby delegated to [Memorial] through the transfer of operation and maintenance of the hospitals.
....

*967 We likewise agree with the Fifth District in this case in noting the distinction between providing materials or services to a public body to facilitate the public body's own performance of its public function and an agreement under which a private actor performs the public function in place of the public body. When the agreement transfers the actual public function, public access follows, as was correctly determined by the Fifth District in its more recent decision in Stanfield v. Salvation Army, 695 So.2d 501 (Fla. 5th DCA 1997), in which the district court held that public access was required for a private entity that completely assumed a governmental obligation in its contract with a county government to provide probationary services. Id. at 502-03.
Memorial I, 729 So.2d at 379-81.
Subsequently, in Weekly Planet, Inc. v. Hillsborough County Aviation Authority, 829 So.2d 970 (Fla. 2d DCA 2002), the second district recognized the supreme court's approval of both tests in Memorial I. It stated:
The case law establishes two general sets of circumstances in which documents in the possession of private entities must be produced as public records. First, when a public entity delegates a statutorily authorized function to a private entity, the records generated by the private entity's performance of that duty become public records. See [Memorial I], 729 So.2d 373 (Fla.1999). Second, when a public entity contracts with a private entity for the provision of certain goods or services to facilitate the public agency's performance of its duties, the private entity's records in that regard may be public if the "totality of the factors" indicates a significant level of involvement by the public agency. See [Schwab], 596 So.2d at 1031.
Id. at 974.

Analysis
Below, the News-Journal argued it was not necessary to evaluate the Schwab factors because the court could simply apply the delegation test. The News-Journal argued that it was immediately apparent that the Authority had delegated its statutory obligation to Memorial, and thus, under Memorial I and Stanfield, public access followed.
The lower court agreed with the News-Journal, finding that it need not analyze the individual Schwab factors because the only "substantial difference" between the current case and the one finally decided by the supreme court in Memorial I was that Memorial leased the hospital in Memorial I and purchased the hospital in the instant case. The lower court concluded that change in relationship did not disturb the ultimate conclusion reached by the supreme court in Memorial I that the "legal effect of this total transfer to [Memorial]... is in reality a delegation of the Authority's authorized function to [Memorial]." Memorial I, 729 So.2d at 380.
On de novo review of the record before us, we conclude the lower court failed to give due consideration to the fact that this case came to it on a vastly different record than the record in Memorial I, on which it so heavily relied. The difference in the two cases cannot be so simply summarized as one involved a lease and the other a sale. The sale agreement in this case is significantly different than the lease agreement in Memorial I. In addition, Memorial filed several affidavits and other documents that went uncontested by News-Journal or Andrews.
Even if the only significant difference between these two cases is that one involved *968 a lease and one involved a sale, we would still hesitate to conclude that such difference does not change the ultimate result without first evaluating the Schwab factors. Afterall, the supreme court in Memorial I attributed significance to this distinction, noting that "[p]ublic scrutiny of these assets should continue as long as the Authority owns these assets." Memorial I, 729 So.2d at 380. Even the News-Journal acknowledged at oral argument that if the Authority had simply sold the hospital to Memorial, without the attached covenants, Memorial would not be subject to the Public Records Act and the Sunshine Law.
In short, we do not believe that a delegation of the Authority's function is so "immediately apparent" from this record as to relieve us of the obligation to analyze the individual Schwab factors under the changed circumstances of this case. That analysis follows.
Level of Public Funding: Under the lease, we found a high level of public funding because of the artificially low lease amount, the Authority's agreement to spend tax revenues on hospital operations and the Authority's transfer of its entire working capital fund to Memorial. News-Journal, 695 So.2d at 421.
Since the sale, public funding has dropped significantly. The Authority has not given Memorial any money for hospital operations or capital improvements. Nor does the Authority lease the hospital to Memorial at a favorable rate. Instead, Memorial owns the hospital and has sole financial responsibility for its operation and maintenance.
The only public funding Memorial receives from the Authority is to reimburse it for indigent care. In an affidavit, the Authority's financial advisor, Gregory LeFils, stated that the Authority spends approximately 25 percent of its revenue to reimburse Memorial for the cost of providing indigent care. For its part, Memorial's Chief Financial Officer, Lawrence Schalk, stated in his affidavit that since the sale, revenue received by Memorial from the Authority accounts for approximately 4.5 percent of Memorial's annual net patient revenue.[4] Over 95 percent of Memorial's net patient revenue comes from other sources such as managed care providers, Medicare, Medicaid and self-paying patients. Accordingly, the level of public funding  4.5 percent of Memorial's annual net patient revenue  is low and does not indicate a "significant level of involvement by the public agency." Schwab, 596 So.2d at 1031.
Commingling of Funds: Under the lease, this Court found commingling of funds because both Memorial and the Authority paid money for hospital expenses. News-Journal Corp., 695 So.2d at 421. In comparing this case to the facts under the lease, we find significance not only in the substantial decrease in the level of public funding, but also in the character of that funding. Under the lease, the Authority spent substantial revenue to reimburse Memorial for the operation and maintenance of the hospital. Because the operation *969 and maintenance of hospitals is deemed to be a public function in the Authority's enabling legislation, it was easy to understand our conclusion that Memorial was acting on behalf of the Authority.
Since the sale, however, the Authority no longer reimburses Memorial for the operation and maintenance of the hospital. It merely reimburses Memorial for the provision of a service  indigent care. Schwab established that a private entity does not "act on behalf of" a public agency "merely by entering into a contract to provide professional services to the agency." Schwab, 596 So.2d at 1032 (citing Parsons & Whittemore, Inc. v. Metropolitan Dade County, 429 So.2d 343 (Fla. 3d DCA 1983)). Nor does this reimbursement establish any commingling of funds.
Whether Activity Conducted on Public Property: Under the lease, hospital operations occurred on public property. Since the sale, hospital operations occur on private property. Memorial owns the hospital, not the Authority. This factor is significant in at least two respects. First, public assets and tax revenues are no longer being used to operate and maintain the hospital. Second, the Authority no longer has any legal responsibility or liability for those assets. As Gregory LeFils noted in his affidavit, Memorial had the option under the lease to "simply turn over a financially-troubled hospital facility to the Authority and walk away, leaving the Authority with a tremendous problem." Now, Memorial owns the hospital and cannot give it back to the Authority.
Whether Services Contracted for are an Integral Part of Public Agency's Chosen Decision-making Process: We previously found that the lease arrangement accomplished the Authority's goal of operating a hospital. News-Journal Corp., 695 So.2d at 421. Since the sale, the Authority is no longer involved in the operation of the hospital. With the exception of reimbursing Memorial for indigent care, the Authority has chosen to direct its resources elsewhere: to reimbursing other hospitals, clinics and other outpatient providers for indigent care services.
Whether Private Entity is Performing a Governmental Function or a Function Which the Public Agency Otherwise Would Perform: Under the lease, we found that Memorial was providing a service that the Authority would otherwise perform based on the Authority's enabling legislation. We concluded that "[i]f the Authority did not provide these services either through a contractual arrangement with some entity or through its own management, then there would be no reason for the Authority to exist." News-Journal Corp., 695 So.2d at 421-22. The supreme court likewise found that the operation and maintenance of hospitals was the "fundamental public mandate" of the Authority's enabling act, upon which the Authority's continued viability depended. Memorial I, 729 So.2d at 379.
While we are certainly mindful of these prior pronouncements, we believe they do not apply to the instant facts. As previously stated, the Authority no longer provides for the operation and maintenance of the hospital as it did under the lease. Does this mean the Authority is no longer viable? No. Under its enabling act, the Authority was empowered to "establish, construct, operate, and maintain such hospital or hospitals as in their opinion shall be necessary for the use of the people of said district." Ch. 57-2085, § 5, at 310, Laws of Fla. (emphasis added). This language expressly contemplates that the authority may "operate and maintain" one or more hospitals in the district.
*970 In addition to hospitals, the act authorizes the establishment of clinics for the use and benefit of the indigent sick. Ch. 57-2085, § 19, at 310, Laws of Fla. (1957). A subsequent amendment to the act empowers the Authority to:
acquire, construct, reconstruct, extend, make additions to, enlarge, improve, repair, remodel, restore, equip, and furnish hospital and other health care facilities now or hereafter located in the district and which are or may be owned by or under the supervision, operation, and control of the district. For the purposes of this section "hospital" or "health care facilities" means any real property or interest therein, building, structure, facility, machinery, equipment, furnishings, or other property suitable for use by the district in connection with its operations or proposed operations, including, without limitation, real property therefore, a clinic, computer facility, food service and preparation facility, health care facility, long-term care facility, hospital, interns' residence, laboratory, laundry, maintenance facility, nurses' residence, nursing home, nursing school, office, professional office building, parking structure and area, pharmacy, recreational facility, research facility, storage facility, utility, or x-ray facility, or any combination of the foregoing; and other structures or facilities related thereto or required or useful for health care purposes, and conducting of research, or the operation of a hospital or other health care facility, including facilities or structures essential or convenient for the orderly conduct of such hospital or other heath care facility and other similar items necessary or convenient for the operation of a particular facility or structure in the manner for which its use is intended.
Ch. 82-383, § 1, Laws of Fla. Pursuant to these provisions, the Authority gives approximately 75 percent of its tax revenue to at least one other hospital and several clinics and other health care facilities in the district.
Furthermore, both the enabling act and section 155.40(4)(b), Florida Statutes, authorize the Authority to sell a hospital. Thus, even if the Authority sells a hospital, it can remain viable by operating and maintaining, or providing for the operation and maintenance of other hospitals, clinics and health care facilities in the district.
Based on this analysis, we conclude that Memorial is no longer performing a function which the public agency otherwise would perform. Unlike the situation under the lease, it is undisputed that the Authority will never resume operation of the hospital, even if Memorial ceases to perform it. The hospital will never revert back to the Authority. The Authority does not want the hospital and does not have to have it. That is why the Authority sold it.
Extent of Public Agency's Involvement with, Regulation of, or Control over Private Entity: Under the lease, we found that the Authority exercised considerable control over Memorial "by virtue of the requirements of the lease and the performance standards established therein. And if there is a default in the lease or a deficiency in the standards of performance, the `lease' may be terminated. This is real control." News-Journal Corp. 695 So.2d at 422. However, the control that the Authority had under the lease ended with the sale of the hospital. The Authority can no longer terminate the lease and take possession of the hospital.
The News-Journal relies on the covenants as evidence that the Authority is still ensuring that its mission is fulfilled through Memorial. Similar to the performance *971 requirements in the lease, the covenants require Memorial to maintain the hospital and its programs according to specified terms. But unlike the lease arrangement, the Authority no longer has the remedy of taking possession of and resuming control over the hospital. Under the sale agreement, the Authority may seek redress for breach of the covenants by going into court and seeking specific performance or perhaps money damages, but it cannot resume operation of the hospital. Having the right to sue for breach of contract does not equate to "involvement with, regulation of, or control over" Memorial.
Andrews concedes that the lack of reverter clause under the sale agreement has eroded the Authority's control over Memorial, but argues that the authority still has the power of the purse, or the power to cut off public money. Theoretically, the Authority could cut off indigent care reimbursement to Memorial, but this would result in withholding only up to 4.5 percent of Memorial's net patient revenue. This hardly amounts to any significant level of control over Memorial. Furthermore, the Authority would be in breach of its contractual obligations and public mission to provide for indigent health care in the district. Thus, the Authority has the power to cut off reimbursement, but the exercise of that power would harm the Authority much more than Memorial.
Whether Private Entity was Created by Public Agency: Under the lease, this Court found that Memorial was created "at the behest of" the Authority. News-Journal Corp., 695 So.2d at 421. However, under the sale, Memorial was reconstituted by its parent company, Adventist Health Systems/Sunbelt, Inc., not by, or at the behest of, the Authority. Accordingly, the Authority had no role in the creation of Memorial other than agreeing to the sale of the hospital and consenting to amendment of Memorial's articles of incorporation, as required by section 155.40(2)(a), Florida Statutes.
Whether Public Agency has a Substantial Financial Interest in Private Entity: Under the lease, this Court found that although the Authority was not an investor in Memorial, it had a substantial financial interest in Memorial based on the first factor  the level of public funding. News-Journal Corp., 695 So.2d at 422.
As discussed above, the Authority's financial interest in Memorial is much less since the sale than it was under the lease. It no longer invests capital into Memorial or provides a facility under a favorable lease. It no longer provides funds for the operation and maintenance of the hospital. It has no ownership interest in Memorial or the hospital. The only financial connection between the Authority and Memorial is through a contract to provide indigent care.
For Whose Benefit Private Entity is Functioning: Under the lease, we analyzed this factor as follows:
In a sense, of course, this is the primary issue before this court. Without doubt it is functioning in the financial interest of itself and its parent company. However, in our view, it is just as surely functioning for the benefit of the Authority in a practical sense by providing hospital services to the inhabitants of the taxing district which, but for the lease and transfer agreement, the Authority would be forced to provide.
News-Journal Corp., 695 So.2d at 422. Under the sale, Memorial is still acting in its own financial interest and that of its parent company. Is it also benefiting the authority by providing hospital services and indigent care to the inhabitants of the district. Unlike the lease arrangement, *972 however, the Authority is no longer "forced to provide" such services in the event of Memorial's breach or its decision to sell the hospital. In such an event, the Authority could sue for damages or specific performance, purchase the hospital under its right of first refusal, or simply choose to direct its resources to new or existing hospitals, clinics or other health care facilities.
Totality of Factors: Analyzing all of the Schwab factors, we conclude that since the sale, Memorial is no longer "acting on behalf of" the Authority and therefore is not subject to the Public Records Act and the Sunshine Law. Accordingly, we reverse the summary judgments below and remand with directions to enter summary judgment in favor of Memorial.
REVERSED AND REMANDED.
SHARP, W. and PALMER, JJ., concur.
NOTES
[1] The phrase "Public Records Act" refers collectively to Article I, section 24(a) of the Florida Constitution and Chapter 119 of the Florida Statutes. The phrase, "Sunshine Law," refers collectively to Article I, section 24(b) of the Florida Constitution and section 286.011(1), Florida Statutes.
[2] Joint Commission on Accreditation of Healthcare Organizations.
[3] Neither article I, section 24(b) nor section 286.011(1) use the "acting on behalf of" language used in section 24(a) and the Public Records Act. In fact, the Florida Supreme Court has refused to engraft such language onto the Sunshine Law. See Memorial Hospital, 729 So.2d at 383. Nevertheless, under the lease, the court held that both the Public Records Act and the Sunshine Law apply to the Authority. Id. at 384.
[4] Schalk defined "net patient revenue" as:

revenue received by the hospital minus patient contractual allowances. For example, if a Medicare patient's charges for hospital services are $20,000, and Medicare only pays the hospital $5,000, the net patient revenue for that transaction is $5,000. The $15,000 which Medicare does not pay is commonly called a "contractual allowance." Net patient revenue differs from net revenue of the hospital in that net patient revenue does not include write-offs for bad debts or income received from ancillary hospital services, e.g., the cafeteria or the gift shop.